**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-492 (RDM)** |
| **v.** | : | |
| | : | |
| **JEREMY GRACE,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jeremy Grace to 60 days' incarceration, 12 months' supervised release, 60 hours of community service, and $500 restitution.

**I.     Introduction**

The defendant Jeremy Grace traveled with his father Jeffrey Grace (Case No. 21-cr-296 (RDM)), to Washington, D.C., from their respective homes in Battle Ground, Washington, and participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On April 8, 2022, Grace pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1): Entering or Remaining in a Restricted Building or Grounds, a Class A Misdemeanor.  As explained herein, a sentence of 60 days' incarceration is appropriate in this case because of the numerous aggravating circumstances in this case.  In particular, Grace: (1) when approaching the U.S. Capitol Building on January 6, was only a few feet behind other front-line rioters who toppled and pushed through barricades and broke through the police lines (*See* Exs. A, B, and C below); (2) was among the very first wave of rioters who unlawfully entered the U.S. Capitol Building, entering at approximately 2:23 p.m., just three minutes after the Vice President and members of Congress began evacuating; (3) pressed forward into the Rotunda, despite witnessing flash bangs, tear gas, and other rioters destroying and appearing to steal federal property, including one who appeared to steal a Congressional lectern (*See* Exs. E and F); (4) escaped the building by climbing through a broken window; (5) responded to the surrounding violence and destruction by proudly taking (and sharing with others) selfie-style photos and videos outside and inside the U.S. Capitol Building, where he gleefully chanted "Our House, Our House," "Just made it into the Capitol here, Oh yeah, oh yeah,"  and "Freedom"; (6) later destroyed evidence by deleting from his cell phone the incriminating selfie-style photos and videos; (7) later, on two separate occasions, falsely claimed to agents of the Federal Bureau of Investigation ("FBI") that he stayed outside the U.S. Capitol Building and falsely denied that his father and he were the two men depicted in the photographs agents presented to him; and (8) months later tried to profit financially from his participation in the January 6 riot, attending in-person sales events with his father, as they hawked clothing and other paraphernalia with phrases such as "Our House" and "Back the Blue" emblazoned on them.

It bears noting that, in arriving at its sentencing recommendation, the government has considered several mitigating factors, including that Grace remained inside the building for a relatively brief period of time and was confined to a fairly narrow footprint, and he that he indicated, shortly after his May 2021 arrest, that he would likely pursue a guilty plea.

The Court must also consider that, as with scores of other defendants, Grace's conduct on January 6 took place in the context of a violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the vote certification integral to the peaceful transition of power. But for his actions alongside so many others, the breach of the Capitol would likely never have happened. Grace's participation in a riot that actually succeeded in halting the Congressional certification, combined with the aggravating factors detailed below, support the recommended sentence of 60 days' incarceration.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid repetition with the Statement of Offense and the PSR, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 31 (Statement of Offense), at ¶¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Grace's conduct and behavior on January 6 and in its aftermath.

### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible. Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak

for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.  At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.  Seeing

this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A.  At about 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.  Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.  By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1.  They flooded the area labeled "Lower West Plaza," Area C on Government's Exhibit 1, pushing against the barricade there.



*Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.




*Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 p.m., Metropolitan Police Department officers

responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.  It
began with two blaring tones, and then a 30-second announcement, which was played on a
continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately.  This order may subject you to arrest
> and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members
of the crowd left.  On the contrary, the mob in the restricted area continued to grow as crowds
streamed towards the West Front, which looked like a battle scene, complete with an active melee
and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the
front of the inauguration stage were flanked, outnumbered, and under continuous assault from the
thousands of rioters directly in front of them as well as members of the mob who had climbed up
onto scaffolding above and to the side of them, many of whom were hurling projectiles.  Because
many of the thousands of people surrounding the officers were not engaged in assaultive conduct,
it was difficult for officers to identify individual attackers or defend themselves.  By 2:28 p.m.,
with their situation untenable and openings in the perimeter having already led to breaches of the
building, several large gaps appeared in the police defensive line at the West Front and a general
retreat was called.  With their defensive lines extinguished, several police officers were surrounded
by the crowd.  The rioters had seized control of the West Plaza and the inauguration stage.  There
were now no manned defenses between the crowd and several entrances into the United States
Capitol Building, allowing the stream of rioters that had started entering the building around 2:13
p.m. to build to a torrent.







*Exhibit 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### *Jeremy Grace's Role in the January 6, 2021, Attack on the Capitol*

On January 4, 2021, Jeremy Grace traveled with his father Jeffrey Grace from their respective homes in Battle Ground, Washington, to Washington, D.C., ostensibly to attend the rally in support of Donald Trump.  *See* ECF 31 at ¶ 8.   They traveled and stayed at a hotel with Jeffrey Grace's friend, Individual A, who was a member of the Proud Boys chapter from the same region.[2]   On the evening of January 5, Grace, his father, and Individual A attended a gathering of Proud Boys from around the country, although Grace was not a member of the Proud Boys.

On January 6, at about 10 a.m., Grace and his father convened with a large group of Proud Boys at the Washington Monument, while former President Trump's rally was underway at the Ellipse, near the White House.  The Graces walked with the Proud Boys from the Washington Monument toward the U.S. Capitol Building.  On the grounds outside the U.S. Capitol Building, Grace and his father were positioned a few feet behind the front line of rioters who were confronting barricades and police officers standing near those barricades as others were knocking over the barricades and pushing past the line of officers.  *See* Ex. A and ECF 31 at ¶ 9.  Grace, appearing in the screenshots set forth as exhibits in this memorandum, was wearing an American flag-themed red, white, and blue baseball cap, with "1776" on the front in white print and a grey sweatshirt with a Betsy Ross-style American flag on the front in black print.

---

[2] Certain individuals associated with the Proud Boys have been charged with crimes associated with their activities on January 6, 2021. *See United States v. Ethan Nordean, et al*, 21-CR-175, ECF No. XX. (June 6, 2022). According to the third superseding indictment, the Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists."  *Id.* ¶ 5. Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group. There is an initiation process for new members of the Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos to public events.  *Id.*



*Ex. A:  Jeremy Grace outside the U.S. Capitol Building*

Grace and his father proceeded toward the U.S. Capitol Building.  At the West Terrace

Plaza, Grace and his father were again positioned a few feet behind the front line of rioters who

were confronting and pushing past a line of law enforcement officers standing guard.  *See* Exs. B

and C.  As noted, as he entered the Capitol grounds, Grace observed fences and other physical

barricades that rioters had toppled over and saw other rioters breach lines of law enforcement

officers.  *See* Ex. A.  He heard flash bangs and saw people being tear-gassed.



*Ex. B:  Jeremy Grace approaching the West Terrace Plaza*



*Ex. C:  Jeremy Grace approaching the West Terrace Plaza*

At approximately 2:23 p.m., three minutes after Senators and House Members began evacuating their respective chambers, Grace and his father were among the first wave of rioters who entered the U.S. Capitol Building.  They entered through the Senate Wing Door on the northwest side.  *See* Ex. D.



*Ex. D:  Jeremy Grace entering the U.S. Capitol Building via Senate Wing Door*

As he entered the building, Grace saw other rioters climbing through broken windows and, indeed, he himself climbed through a broken window in order to exit.  *See* Exs. D, E.  Once inside the building, Grace and his father walked together to the Rotunda.  They entered the Rotunda at approximately 2:25 p.m. from the north entrance and remained inside the Rotunda for approximately five minutes.  *See* ECF 31 at ¶ 10.

While inside the Rotunda, Grace stood right next to and watched as another rioter appeared to steal a Congressional lectern.  *See* Exs. E and F.



*Ex. E:   Jeremy Grace in the Rotunda watching another rioter attempting to steal a Congressional lectern.*



*Ex. F:  Jeremy Grace in the Rotunda in a widely-circulated photograph depicting another rioter attempting to steal a Congressional lectern.*

When Grace was both inside and outside the U.S. Capitol Building, Grace used his cell phone to take several selfie-style videos and photographs.  *See* Exs. F and G.  He later sent these videos to his father.  In one, taken at approximately 2:18 p.m., Grace recorded a video that depicted his father and him outside the U.S. Capitol Building, while both repeatedly chanted, "Our house." In another, taken at approximately 2:25 p.m., Grace recorded a video that depicted his father and him inside the Rotunda.  In it Grace stated, "Just made it into the Capitol here. Oh yeah, oh yeah." His father stated, "It gets no better than this."  Grace then stated, "Freedom."  His father replied, "God bless America."  *See* ECF 31 at ¶ 11.  *See* Exs. G and H.



*Ex. G:  Jeremy Grace inside the Rotunda*



*Ex. H:  Jeremy Grace outside the U.S. Capitol Building*

In order to exit the building, Grace climbed out a broken window, adjacent to the door through which his father and he initially entered.  *See* Ex. I.  At approximately 2:31 p.m., they exited the U.S. Capitol Building.  *See* ECF 31 at ¶ 10.



*Ex. I:  Jeremy Grace exiting the U.S. Capitol Building via broken window near Senate Wing Door*

**Grace's Deletion of Evidence and Repeated False Statements to Law Enforcement Officers**

The photograph of the rioter with the Congressional lectern, depicted in Exhibit F, above, went "viral" and was widely disseminated in the media; Grace and his father were visible in the background of the photograph.  On or before January 8, Grace then deleted the selfie-videos and photographs he had taken on January 6.  *See* ECF 31 at ¶ 11.

Grace voluntarily agreed to multiple interviews with the FBI, both before and at the time of his arrest.  During the first interview, conducted by telephone on January 25, 2021, Grace admitted that he traveled to Washington, D.C. with his father but falsely told the interviewing agent that, on January 6, he became separated from his father when "things got crazy" at the rally.  He falsely claimed that he stayed back from the U.S. Capitol Building and that the closest he got was in a "roundabout" outside the building.

As the investigation continued, photographs, videos, CCTV footage, and cell phone location data revealed that Grace had, in fact, entered the U.S. Capitol Building with his father on January 6.  On May 26, 2021, agents again interviewed Grace, this time in person.  At this

interview, Grace again falsely claimed that he did not enter the U.S. Capitol Building and did not

go past the "roundabout."  When agents showed Grace a photograph from January 6 that

depicted his father and him walking toward the U.S. Capitol Building, Grace falsely denied that

he was the individual depicted in it (#1 in Ex. J).  He also falsely stated that he did not recognize

his father (#2 in Ex. J) in the photograph.  *See* Ex. J.



*Ex. J:  Photograph of Jeremy Grace and Jeffrey Grace shown to Jeremy Grace by FBI during*

*May 2021 interview*

### *Grace's Capitalizing on His Participation in the January 6 Riot*

In the aftermath of January 6, Grace assisted his father's commercial efforts to capitalize

on their participation in the January 6 riots.  As recently as July and August 2021, Grace helped

his father sell t-shirts, baseball caps, water bottles, decals, and other paraphernalia with phrases

like "Our House," "These Colors Don't Run," "Back the Blue," and images of the U.S. Capitol

Building, some with an American flag emblazed on them.

### *The Charges and Plea Agreement*

On May 24, 2021, Grace was charged by complaint with violating 18 U.S.C. § 1752(a)(1) (unlawful entry of a restricted building); 18 U.S.C. § 1752(a)(2) (disorderly conduct in a restricted building); 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building or grounds); and 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in a Capitol Building.). *See* ECF 1. On May 25, 2021, Grace was arrested near his workplace in Oregon. On July 27, 2021, Grace was charged in a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). *See* ECF 12. On April 8, 2022, he pleaded guilty, pursuant to a written plea agreement, to Count One of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1), unlawful entry of a restricted building. *See* ECF 30.

In connection with his plea agreement, Grace admitted that he did unlawfully and knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting, without lawful authority to do so. *See* ECF 30 and 31.

### III.    Statutory Penalties

Grace now faces sentencing on a single count of violating 18 U.S.C. § 1752(a)(1). As noted in the plea agreement, ECF 1 at ¶ 1,  and in the U.S. Probation Office's Presentencing  Report ("PSR"), Grace faces up to one year of imprisonment; a fine of up to $100,000, pursuant to 18 U.S.C. § 3571(b)(5); a term of supervised release of not more than one year, pursuant to 18 U.S.C. § 3583(b)(3); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made. Grace must also pay restitution under the terms of his plea agreement of $500. *See* ECF 30 at ¶ 15. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).   In addition, pursuant to 18 U.S.C. § 3013(a)(1)(A)(iii), Grace must pay a

special assessment of $25 to the Clerk of the United States District Court for the District of Columbia.  *See also* ECF 30 at ¶ 1.

As this offense is a Class A Misdemeanor, *see* 18 U.S.C. § 3559(a)(6), the Sentencing Guidelines apply.  *See United States v. Maul*, 205 F. App'x 456, 458 (7th Cir. 2006) (unpublished). 18 U.S.C. § 1752(a)(1) is a Class A Misdemeanor. *Compare* U.S.S.G. §1B1.9 (Sentencing Guidelines do not apply to Class B or C Misdemeanors).

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.*

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Grace's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics | |
| (Restricted Building) (U.S.S.G. §2B2.3(b)(1)(A)) | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 30-39.

The U.S. Probation Office calculated Grace's criminal history as a category I, which is not disputed.  PSR at ¶ 42.  Accordingly, the U.S. Probation Office calculated Grace's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment

range at 0-6 months.  PSR at ¶¶ 39, 82.  Grace's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).  As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"  *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.  Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.  As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).  "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### Sentencing Factors Under 18 U.S.C. § 3553(a)

In this Class A misdemeanor case, sentencing is next guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of the recommended sentence of 60 days' incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while looking at Grace's individual conduct, this Court must assess the spectrum of aggravating and mitigating factors, to include:  (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from, law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to his or her fair and just punishment.

22

To be clear, had Grace personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct.   The absence of violent or destructive acts on Grace's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Grace from most other misdemeanor defendants.

As noted, Grace traveled across the country to Washington, D.C. with his father and another man, Individual A, who was a member of the Proud Boy extremist group from the same region, ostensibly to attend the rally for former President Trump.   On the evening of January 5, Grace then met up with a large gathering of Proud Boys from around the country.   On the morning of January 6, Grace congregated with a large group of Proud Boys at the Washington Monument and then marched alongside them to the U.S. Capitol Building. Notably, despite his claims that he came to D.C. to attend the rally for former President Trump, Grace did not even attend the rally that day.

Moreover, as discussed above, Grace was among the very first wave of rioters who illegally entered the U.S. Capitol Building and entered the Rotunda, specifically.   Grace stood by while other rioters only a few feet ahead of him toppled over barricades and confronted and pushed pass a line of police officers.   Grace then capitalized on his fellow rioters' property destruction and confrontations with law enforcement by unlawfully entering the Capitol in their wake.   Grace and the others who first breached the U.S. Capitol bear a special responsibility for this unparalleled crime because they emboldened the rioters who came behind them and were therefore each vitally important and thus responsible for the large crowd that overwhelmed the police officers through both violence and also sheer numbers.

While no police officers blocked his path through the doors when he entered, there were clear signs of recent violent entry.   Other rioters had just smashed out the window adjacent to the

door through which Grace passed.  Grace had to climb through one of the broken windows to exit the building.   Grace was aware that tear gas had been deployed.  Once inside the Rotunda, Grace was undeterred by other rioters apparently stealing property.  Grace stood inches away from and looked directly at another rioter who appeared to be stealing a Congressional lectern.

Grace's immediate reaction to the mayhem and destruction surrounding him was to take selfie-style videos and photographs, smiling and chanting "patriotic" slogans like "Our House" and "Freedom."  Grace's conduct in the aftermath of January 6 further supports the government's recommended 60-day custodial sentence in this case.   As Grace admitted in connection with his plea agreement, sometime before January 8, he destroyed the three incriminating "selfie"-style videos from his cell phone.

As noted above, in the wake of the riot, Grace also lied to FBI agents during two separate interviews, in January and again in May 2021.  Both times he falsely claimed that he had been separated from his father and falsely denied that he entered the U.S. Capitol Building.  During his FBI interview in May, even when confronted with photographic evidence of his crimes, Grace continued to lie.  In the presence of a federal law enforcement agent, he stared at a photograph clearly depicting himself and his father at the Capitol on January 6 and claimed that he did not know who was in the photographs. *See* Ex. J.

In July and August 2021, Grace attempted to capitalize on his criminal conduct.  He, along with his father and other family members, attended in-person sales events, where his father's January 6-related "Our House," "Back the Blue," and other paraphernalia were for sale.[3]   The irony, not to mention audacity, of selling "Back the Blue"-labeled paraphernalia in the context of

---

[3]On at least one occasion, Grace, his wife, and his father tended a sales booth where this type of merchandise was displayed on a table alongside a photograph of them standing together in front of the U.S. Capitol Building.

January 6 is especially disturbing.  On January 6, Grace watched other rioters physically and verbally confront law enforcement officers.  Moreover, by the time Grace hawked these "Back the Blue" products, he was likely aware of the widely-reported physical and emotional injuries suffered by law enforcement officers on January 6.  He then lied twice to the very types of law enforcement agents he claimed to "back" and support.  Grace was disrespecting, not "backing," the blue.  As explained below, Grace, as a military veteran, had (or should have had) a heightened awareness of the great jeopardy posed by violent entry into the Capitol by the rioters, and Grace was also aware of the violence required to make that entry into the Capitol and the attendant risks to property and human life.

In addition to the above-described aggravating factors, the government is mindful of a few mitigating factors.  As noted, Grace spent a limited time period (approximately eight minutes) inside the U.S. Capitol Building and limited his footprint to the Rotunda.    Furthermore, shortly after Grace was arrested, Grace indicated through his attorney that he intended to plead guilty.

Ultimately, the Court must also consider that Grace's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Grace's History and Characteristics

Grace is 38 years old and works as an electrician.  Grace served as an enlisted person in the U.S. Navy from 2002-2006.  He was at one point deployed on a carrier and was honorably discharged in 2006.  He has complied with his conditions of pre-trial release.  As set forth in the PSR, Grace has no criminal history.  PSR at ¶ 42.

While Grace's military service is laudable, as alluded to above, it renders his conduct on January 6 all the more troubling. As a former military member, Grace was well aware he had no right to enter restricted government buildings. His voluntary decision to storm a guarded government building is that much more disturbing in light of his former military service and training.  As a former service member, his "Our House" and "Freedom" chants are especially troubling.  He would understand even more keenly that civilians were not permitted onto restricted areas, such as military bases, for instance, merely because, for example, they wanted to be there and considered it "theirs."

Grace's decision to help his father sell "Our House" and "Back the Blue" paraphernalia to capitalize on his criminal conduct is also quite troubling.  Grace was part of mob that stormed the U.S. Capitol Building---he put our law makers' and our law enforcement officers' safety at risk and threatened the rule of law.  Grace made no attempt to assist the law enforcement officers who were under siege that day.  Over a hundred officers were injured that day.  Grace's belief that he is somehow aligned with and supports law enforcement officers is an affront to law enforcement and the rule of law, and shows that Grace does not appreciate the seriousness of his criminal conduct.  This, coupled with his complete lack of remorse, makes it that much more likely that he will recidivate, which in turn supports the recommended 60-day custodial sentence.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

we have: the peaceful transfer of power to a newly elected President. As noted by this Court during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. This was not a protest, as this very Court noted during an earlier sentencing hearing. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Grace's words, his blatant lies to the FBI during two separate interviews, his deletion of evidence, and his capitalizing on his wrongdoing clearly demonstrate the need for specific deterrence for this defendant. Grace was mere feet behind the front line, pushing past the police line not once but twice. As Grace unlawfully entered the U.S. Capitol Building with a crowd of rioters, he saw broken windows, he knew the police had deployed tear gas, and he saw an individual attempting to steal a wooden lectern from the Rotunda.

As of the date of this filing, Grace has not expressed remorse. When interviewed by the FBI at the time of his arrest, he repeatedly lied and claimed that he never entered the U.S. Capitol Building. He brazenly examined photographs of himself and his father and denied recognizing either one.

The government acknowledges that Grace accepted responsibility by entering into this plea agreement. On the other hand, Grace's repeated lies to law enforcement; his deletion of evidence; his attempts to capitalize from his crimes, and his lack of remorse underscore the need for specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not necessarily become the default.[6] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19.*

The government and the sentencing courts have made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or

---

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentences imposed on Adam Johnson, William Tryon, Nolan Kidd, and Micajah Jackson for reference.

In *United States v. Adam Johnson*, 21-cr-648, Judge Walton imposed a sentence of 75 days' incarceration, followed by 12 months of supervised release.  In that case, the defendant, like Grace, pleaded guilty to violating 18 U.S.C. § 1752(a)(1).  Johnson, who is depicted in the photograph of

Grace in Exhibits E and F, entered the Rotunda and temporarily stole and carried the podium belonging to the Speaker of the U.S. House of Representatives, for an apparent "photo op." There are several key similarities. Both pleaded guilty to the same crimes; both were at or near the front line of rioters who breached the Capitol (Johnson entered the Senate Wing door at 2:20; Grace entered the Rotunda door at 2:23); both witnessed other rioters destroying property and physically confronting law enforcement; both observed officers deploying tear gas and flash bangs to disburse the crowd; both entered through doors that were adjacent to rioters climbing through broken windows; and both destroyed electronic evidence after the fact, deleting photos and other evidence from their cell phones.

There are some notable differences between Grace and Johnson. Grace, unlike Johnson, lied to law enforcement officers, and he attempted to profit off his criminal activity. Although not himself a "Proud Boy," Grace was "Proud Boy-adjacent" in that he traveled and met with known Proud Boys and his father was a "probate" of the Proud Boys. There is no indication that Johnson was in any way associating with Proud Boys or other similar groups. Admittedly, Johnson had other aggravating factors, not present here: Johnson remained in the U.S. Capitol Building for 35 minutes and traveled to various other parts of the building, whereas Grace was there for eight minutes and only went to the Rotunda. Moreover, unlike Grace, Johnson temporarily stole the podium. Grace did not attempt to steal anything inside the Capitol.

Johnson had several mitigating factors not present here. Most notably, Johnson voluntarily surrendered to law enforcement officials a mere two days after the riot (as compared to Grace, who lied to the FBI to try to avoid being caught). Very early on, Johnson also not only indicated a willingness to plead guilty but also to enter a cooperation agreement. Grace did not express any interest in cooperation.

In *United States v. William Tryon*, 21-cr-420, Judge Walton imposed a sentence of 50 days' incarceration.  Tyron, like Grace, pleaded guilty to violating 18 U.S.C. § 1752(a)(1).  Tryon, like Grace, was inside the U.S. Capitol Building for fewer than 10 minutes; he entered through a door that was flanked by broken windows; and witnessed physical confrontations with police and property destruction.   There are some notable differences between Grace and Tryon, some in Grace's favor, some not.  Tryon confronted significantly more resistance from police.  He was, at one point, pepper sprayed and hit with a baton by police and had initially been barred from entry, only to try to re-enter via a different route.  Tryon was in a more chaotic part of the U.S. Capitol Building, where he could hear shots fired and see a fire extinguisher going off nearby.   On the other hand, there is no indication that Tryon, like Grace, lied to law enforcement officers, destroyed evidence, or sought to profit from his criminal conduct.

In *United States v. Nolan Kidd*, 21-cr-429, Judge Cooper imposed a 45-day sentence. There, Kidd pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G), a less serious misdemeanor. Kidd was inside the U.S. Capitol Building for about 40 minutes, having been sprayed with tear-gas by officers beforehand.  Like Grace, Kidd was among the first wave of rioters to enter the building, tried to hide his involvement after the fact by removing photos from his social media page, and, although he admitted during an interview with law enforcement officers that he entered the U.S. Capitol Building and deleted photos from his Facebook page, he provided other details that were misleading.  He, like Grace, filmed and celebrated the riot and showed a lack of remorse. Unlike Grace, Kidd admitted that he went into the U.S. Capitol Building, there is no indication that Kidd attempted to delete evidence (as opposed to remove posts), and he did not attempt to sell merchandise or otherwise profit from his crimes.

In *United States v. Micajah Jackson*, 21-cr-484, this Court sentenced Jackson to serve 90 days in a residential halfway house, followed by 36 months' probation.  There, Jackson pleaded guilty to a less serious misdemeanor, violating 40 U.S.C. § 5104(e)(2)(G).  Jackson, like Grace, was a military veteran who was among the first group of rioters to breach the Capitol. Significantly, however, Jackson had major mitigating circumstances not present here:  he suffered from serious mental health issues, many of which were lifelong afflictions.   Moreover, when initially interviewed by FBI agents, Jackson tearfully admitted his conduct; whereas here, Grace repeatedly told FBI agents that he did not enter the U.S. Capitol Building.  There is no indication that, like Grace, Jackson deleted photos or videos or attempted to profit from his crimes.

Ultimately, the 60-day recommendation for Grace is in line with the 75-day sentence imposed on Johnson, the 50-day sentence imposed on Tryon, the 45-day sentence imposed on Kidd, and the 90-day halfway house sentence imposed on Jackson.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

V.      **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Grace to a within-Guideline's sentence of 60 days' incarceration, 12 months' supervised release, 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:      */s/Mona Sedky*

MONA SEDKY
Special Assistant United States Attorney
U.S. Attorney's Office
601 D Street, N.W., 5th Floor
Washington, D.C.  20530
202-262-7122
Mona.Sedky2 @usdoj.gov